**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**


**KAREN JACKSON,**

      **Plaintiff,**

                                   **Civil Action 2:16-cv-307**
**vs.**                                   **Magistrate Judge Elizabeth P. Deavers**


**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**


## OPINION and ORDER

Plaintiff, Karen Jackson, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits. This matter is before the Court for consideration of Plaintiff's Statement of Errors (ECF No. 14) and the Commissioner's Memorandum in Opposition (ECF No. 18). For the reasons that follow, Plaintiff's Statement of Errors is **AFFIRMED** and the Commissioner of Social Security's nondisability finding is **REVERSED** and **REMANDED** to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I.      BACKGROUND

On September 2, 2010, Plaintiff filed applications for both supplemental security income and disability insurance benefits. (R. at 17, 281-282.) Plaintiff maintains that she became disabled on May 1, 2010, as a result of low back pain, PTSD, depression, migraines, and confinement to a wheelchair. (R. at 293, 338.) Plaintiff's applications were denied initially and

upon reconsideration.  (R. at 17, 202-205, 207-209.)  On August 6, 2012 Administrative Law

Judge (the "ALJ") Ryan Glaze held a hearing at which Plaintiff, represented by counsel, and a

vocational expert appeared.  (R. 81-146.)   On January 18, 2013, the ALJ issued his decision

concluding that Plaintiff is not disabled.  (R. at 176.)  On April 15, 2014, Plaintiff requested

Appeals Council review, and the Appeals Council remanded the case to the ALJ to obtain

additional evidence regarding Plaintiff's physical and mental impairments and to give further

consideration to Plaintiff's residual functional capacity.  (R. at 197-200.)  On November 6, 2014,

the ALJ held another hearing at which Plaintiff, represented by counsel, and a vocational expert

appeared.  (R. at 38-146.)  Upon reconsideration, the ALJ found that Plaintiff is not disabled

because she is able to perform her past relevant work.  (R. at 30.)

On December 7, 2014, Plaintiff filed a Request for Review of the ALJ's decision.  (R. at

12.)   After Plaintiff requested additional time before review, the Appeals Council eventually

denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final

decision on February 17, 2016.  (R. at 1–6.)  Plaintiff then timely commenced the instant action.

(ECF No. 1.)

## II.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff testified that she lives in her own house with her fourteen year-old son, her

sister, and her sister's husband.  (R. at 45.)  According to Plaintiff, her sister moved in with her

in order to help her when she started experiencing back problems.  (R. at 46.)  Plaintiff stated

that her son had developmental delays and suffers from seizures, which require her to help him

with homework.  (R. at 45.)  Plaintiff stated that she received an honorable discharge from the

military and that she has a 90% disability rating from the Veteran's Administration ("VA"), which has determined that she is unemployable. (R. at 66.)

Plaintiff testified that she used to work at Ohio Health Corp. as a data analyst for approximately three years. (R. at 46.) Plaintiff also testified that she also used to work at the Liberty County Board of Education as a secretary and substitute teacher and at Mt. Sinai Missionary Baptist Church as an administrative assistant. (R. at 47-48.) Plaintiff further testified that between 2007 and 2009 she was working as a substitute teacher while she completed her master's degree in education online. (R. at 51.)

When asked why she feels she cannot work, Plaintiff testified that she has severe back problems and headaches a couple of times a week. (R. at 49.) She reported that medication does help her migraine symptoms. Plaintiff also stated that she began using a walker after falling and experiencing "really severe" back pain. (R. at 52.) She further stated that three lumbar ablations performed at the Veteran's Administration hospital in Columbus, Ohio, helped with her back pain.

When asked about her back pain, Plaintiff stated that she experiences sharp pain going down her left leg. (R. at 55.) Plaintiff further stated that on an average day, she experiences a pain level of six out of ten, although she experiences "[p]robably four days" per week with pain greater than that. (R. at 55-56.) Plaintiff stated that on some days her back pain requires her to stay in bed all day and that on others, even though she could get out of bed, she had to use her TENS unit approximately ten hours during the day. (R. at 56.) According to Plaintiff, however, the TENS unit only provides temporary relief of her back pain. (*Id.*) Plaintiff added that when she experienced periods of extreme pain that she was unable to concentrate on her graduate work

and "pretty much wait until I feel better." (R. at 58.) She also testified that she sometimes cannot bend down far enough to tie her shoes. (R. at 59.)

When asked about her lumbar ablation treatments, Plaintiff testified that the first two gave her complete, if temporary, relief from her back pain. (R. at 57.) She stated that the third one had no effect and that her back pain is currently 80% of what it was before beginning ablation treatment. (*Id*.)

Plaintiff, who is right-handed, testified that she also suffers from arthritis in her right fingers and wrist, which prevents her from typing like she used to. (R. at 59.) Plaintiff also testified that she wears an arm brace daily since 1997, which interferes with opening cans and bottles, using utensils, and typing. (R. at 60.)

Plaintiff stated that she wears a brace for her right ankle and has a cyst on the bottom of her right foot. (R. at 61.) She further stated that she can only walk for approximately fifteen minutes at a time. (Id.) Plaintiff also testified that she can only sit for thirty or forty-five minutes before she has to stand up, which she can only do for thirty minutes before she has to sit again. (*Id*.) She explained, however, that on a bad day she cannot do anything except stay in bed. (R. at 62.)

Plaintiff testified that she suffers mental health symptoms resulting from a sexual assault she suffered in the 1990s. (R. at 62.) She stated that she has recurring dreams, up to a few times per week, about the sexual assault and of someone chasing her. (R. at 62-63.) She also stated that the dreams interfere with her ability to sleep and exacerbate other problems that affect her sleep, such as her back pain. (R. at 63.) Plaintiff said that, in general, she suffers interrupted sleep, gets up to see her son off to school, goes back to bed, and then gets up around noon. (*Id*.)

Plaintiff further testified that she suffers "trust issues around people," particularly strangers, because of the sexual assault. (R. at 64.) Plaintiff explained that she only socializes with her family and goes to the movies "occasionally" with her sister but not anywhere else. (*Id.*) She testified that she does not do anything with her sister's husband. (R. at 70.) She stated that she sometimes goes to the grocery store, but other times her sister goes for her. (R. at 65.) Plaintiff also stated that she drives. (R. at 70.) Plaintiff testified that before her alleged onset she enjoyed several hobbies, including tennis, racquetball, jogging, and sewing, but, now, she engages in none. (R. at 64.)

Plaintiff stated that she also suffers from diabetes, as well as sleep apnea, which she treats with a CPAP machine every night. (R. at 66-67.) Plaintiff further stated that her diabetes medication Metformin causes diarrhea and that she suffers side effects, such as headaches, from some of her other medications, although she does not know which ones. (R. at 67-68.)

**B.    Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past jobs include administrative assistant, classified as a sedentary, skilled job and data communications analyst, a light, skilled job. (R. at 73.)

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 73-77.) One of the exchanges, based on the ALJ's eventual RFC determination, went as follows:

> ALJ: If I indicated that this individual should be precluded from high production quotas such as piece work or assembly line work, strict time requirements, arbitration, negotiation, confrontation, directing the work of others, being responsible for the safety of others how would that change your answer? Would this individual still be able to perform the past relevant work of the claimant?

VE: Actually the data analyst job would, and, actually and the administrative assistant, both of those, not necessarily the issue would be fast paced by they do have like negotiating and some of the higher level activities associated with performance of the job but I would not preclude them for fast paced.

(R. at 74.)

## III.  MEDICAL RECORDS

**A.  Physical Impairments**

**1.  Charles P. Wylie VA Ambulatory Care Center**

An August 30, 2010 x-ray revealed mild degenerative changes of Plaintiff's lumbar spine.  (R. at 753-754.)  Diane Speelman, CNP, ordered a chiropractic follow-up and physical therapy.  (R. at 754.)  Plaintiff participated in both chiropractic treatment and physical therapy throughout the period in question in order to manage her lower back pain.  (R. at 751-752, 778-782, 840-846, 904-907, 910-912, 922-924, 930-932, 937-938, 940-941, 945-949.)  Plaintiff received both a community walker and a TENS unit in the fall of 2010.  (R. at 900-901, 919.)  On November 1, 2010, Plaintiff reported lower back pain of nine on a scale of ten to the triage clinic at the VA hospital.  (R. at 755.)  On November 10, 2010, Plaintiff underwent an MRI of her lumbar spine, which showed loss of signal intensity in the L4-L5 and L5-S1 disc spaces and mild broad-based disc protrusion posteriorly in the right paracentral area at L5-S1.  (R. at 960.)  Plaintiff subsequently received a back brace that December.  (R. at 945.)

On April 1, 2011, Plaintiff saw a neurologist for recurring headaches.  (R. at 856-860.)  During the visit, Plaintiff reported neck pain and stiffness, lower back pain, and right-hand numbness.  (R. at 857.)  Plaintiff received an additional prescription for Topamax.  (R. at 860.)

On May 2, 2011, Plaintiff saw Andrew J. Iams, M.D. for pain along the base of her thumb and tenderness over the snuff box region.  (R. at 1023-1024.)  Plaintiff received a referral

to occupational therapy to address her finger pain and tenderness. (R. at 1024.) On June 7, 2011, Plaintiff attended occupational therapy and reported pain, numbness, and tingling in the first three digits of her right hand. (R. at 1000.) She also reported dropping things, difficulty using a keyboard and mouse for more than thirty minutes daily, unscrewing lids, buttoning, and pinching or making a fist. (*Id*.) The evaluating therapist found tenderness and tightness of the extensor pollicus and wrist extensors and flexors, some reduced range of motion in the right wrist, and an inability to grip and pinch on the right side during strength testing. (R. at 1000-1001.)

On August 12, 2012, Plaintiff underwent a lumbar x-ray, which showed "minimal diffuse degenerate changes with tiny marginal spurs." (R. at 1404.) On February 11, 2013, Plaintiff received x-rays of her right hand and wrist, which revealed "mild radiocarpal joint osteoarthrosis." (R. at 1402.) On February 22, 2013 Edwin H. Season, M.D., an orthopedic surgeon, assessed Plaintiff with "Myofascial pain at right forearm. Very mild OA right wrist. Status post ganglion cyst excision with keloid scar formation. Status post laceration dorsal index along fingers with residual pain/tenderness." (R. at 1505.) Dr. Season told Plaintiff that her "pain problems were complex and long-standing and probably would not be easily fixed." (*Id*.)

On April 12, 2013, Robin Jones, CNP, saw Plaintiff as part of her VA disability evaluation. (R. at 1695-1757.) Ms. Jones found Plaintiff to have limited lumbar range of motion and pain on palpation across her lower lumbar spine. (R. at 1722, 1725.) Ms. Jones noted that Plaintiff suffers from documented spinal arthritis requiring regular use of a brace, walker, and TENS unit. ( R. at 1729-1731.) She also noted that prolonged sitting, standing, or walking causes Plaintiff pain and requires her to lie down and use her TENS unit. (R. at 1732.) Ms.

Jones opined that Plaintiff should be limited to a sedentary, indoor job in a low stress environment, with minimal or no lifting over ten pounds and minimal or no standing and walking. (R. at 1699.)

On August 1, 2013, Plaintiff saw Remone T. Yousif, M.D., at the VA pain clinic. (R. at 1486-1488.) Upon examination, Dr. Yousif found Plaintiff to suffer from SI tenderness, increased pain with deep palpation of paraspinal muscles, facet challenge on the left, and increased pain with extension and lateral rotation. (R. at 1488.) Dr. Yousiff concluded that Plaintiff's pain is most likely due to lumbar spondylosis. (*Id*.) He prescribed a medial branch block and continued use of a TENS unit and all current medications. (*Id*.) Plaintiff underwent medial branch blocks on August 26, 2013 and radiofrequency ablation on September 16, 2013. (R. at 1460-1462, 1464-1465.)

On May 1, 2014, Plaintiff saw Dr. Yousif again. (R. at 1532-1534.) She reported complete relief of her pain for six months following the September 2013 ablation treatment. (R. at 1532.) Plaintiff reported, however, that her pain slowly returned over the previous few months and reached maximum intensity one or two times weekly. (*Id*.) Dr. Yousif noted Plaintiff's improvement, recommended another ablation treatment, and changed her prescription from meloxicam to naproxen. (R. at 1533.)

On October 28, 2014, Plaintiff saw James Stoshak, P.T., for a functional capacity evaluation. (R. at 1846-1854.) Mr. Stoshak reported markedly decreased key grip values for Plaintiff's right hand and non-functional values on other grip tests with her right hand. (R. at 1847-1848, 1853.) Plaintiff ended the static standing test after eleven minutes and the walking

test after six minutes because of back pain. (R. at 1852, 1853.) Mr. Stoshak found Plaintiff non-functional in both single- and double-knee kneeling and crawling. (R. at 1849.)

### 2. Ohio Orthopaedic Center

On June 27, 2012, Plaintiff saw Steven V. Priano, M.D., for progressive numbness in her right hand. (R. at 1377-1378.) Dr. Priano reported a positive Phalen's test, a positive median nerve compression test, and some thenar muscle atrophy. (R. at 1378.) Dr. Priano assessed Plaintiff to have "significant carpal tunnel syndrome" and ordered an EMG to confirm. (*Id*.) Consulting physician Brian J. Oricoli, M.D., reported that Plaintiff's pain stems from a 1979 laceration and a 2003 ganglion cyst resection. (R. at 1379-1381.) Dr. Oricoli concluded that tendinitis is the source of Plaintiff's current pain, and Dr. Priano concurred. (R. at 1376, 1379-1381.)

### 3. State Agency Evaluation

On January 4, 2011, W. Jerry McCLoud, M.D., reviewed Plaintiff's file and completed a physical residual functional capacity assessment on behalf of the state agency. (R. at 153-154.) Dr. McCloud opined that Plaintiff could perform light work with occasional climbing and stooping, frequent kneeling, crawling and crouching, with no exposure to unprotected heights. (R. at 153-154.) On May 10, 2011, Maria Congbalay, M.D. completed a physical residual functional capacity assessment as part of the reconsideration review in this case and found, *contra* Dr. McCloud, that Plaintiff cannot climb ladders, ropes, or scaffolds and that she could only occasionally crouch due to her back pain. (R. at 168-170.)

**B.    Mental Impairments**

**1.  Charles P. Wylie VA Ambulatory Care Center**

On August 9, 2010, Patrice Arehart, M.D. conducted a psychiatric consultation and reported symptoms of depression, anxiety, and headaches caused by the sexual assault that Plaintiff suffered in 1994.  (R. at 686-688.)  Dr. Arehart noted depressed mood, a restricted affect, reports of intrusive thoughts, low energy, decreased interest in pleasurable activities, occasional irritability, poor sleep, and nightmares of being chased.  (R. at 687-688.)  On August 30, 2010, Shaheena Minhas, M.D., a psychiatrist, saw Plaintiff and noted back pain and discomfort.  (R. at 691-696.)  Plaintiff reported that she is afraid to take other medications when she takes Sumatriptan for her headaches because of potential adverse reactions.  (R. at 693.)  Dr. Minhas noted that Plaintiff was taking thirteen medications and recommended continuing all of them.  (R. at 693-694.)

On October 1, 2010, Psychologist Louise Weller, Ph.D., of the VA PTSD team examined Plaintiff.  (R. at 941-943.)  Dr. Weller noted that Plaintiff's mood was "tempered by sadness" and that she suffered from back pain, arriving in a wheelchair due to the distances necessary to move around the VA hospital.  (R. at 942.)  According to Dr. Weller, during the course of the one-hour session, Plaintiff exhibited fidgeting, made seat adjustments, and had to stand "a few times" due to her back pain.  (*Id.*)  Plaintiff told Dr. Weller that she was sad that she had not dated for many years and that she wished she could date again and possibly marry.  (*Id.*)  Plaintiff also reported that she missed going out with her friends and that she would like "to be able to trust again."  (R. at 942-943.)  Plaintiff further reported that, for two years, she has had no desire to engage in her previous hobbies, such as going to the movies, bowling, and tennis.  (R. at 943.)  Dr. Weller

recommended delaying psychotherapy for her mental health issues until her other providers could effectively treat her chronic pain.  (R. at 943.)

On April 1, 2011, Dr. Minhas reported that Plaintiff used a walker to get around and had to change position from sitting to standing throughout the visit because of pain.  (R. at 852-856.) Plaintiff reported increased depression, problems sleeping, complete absence of social activity, and difficulty concentrating.  (R. at 852.)  Dr. Minhas cancelled plaintiffs alprazolam treatment and prescribed Wellbutrin.  (R. at 855.)  During a follow-up visit on May 23, 2011, Plaintiff reported improvement because her sleep had improved.  (R. at 1008.)  Plaintiff also reported improved diet and exercise, but also continued absence of social activity and difficulty with concentration and motivation.  (*Id*.)

On September 16, 2011, Dr. Matthew C. Stevenson, M.D., covered for Dr. Minhas and saw Plaintiff.  (R. at 1180-1183.)  Plaintiff reported increased anxiety and depression and stated that she was not taking her citalopram because of concerns about adverse reactions while simultaneously taking buproprin.  (R. at 1180.)  Dr. Stevenson advised her to continue her citalopram.  (R. at 1182.)

On October 24, 2011, Plaintiff saw VA psychiatrist Alice A. Hale, M.D.  (R. at 1174-1177.)  She reported continued lack of social interaction and daily sadness, as well as difficulty sleeping through the night.  (R. at 1175.)  Plaintiff complained of tingling in her feet and feeling tired since she started taking buproprin.  (*Id*.)  Dr. Hale noted that Plaintiff had been hospitalized six or seven times for depression prior to 2007.  (*Id*.)  Dr. Hale found Plaintiff's affect depressed but appropriate and found her mood depressed.  (R. at 1176.)  Dr. Hale increased Plaintiff's buproprin dosage and changed her trazodone dosage to "as needed."  (R. at

1177.)  On March 16, 2012, Dr. Hale saw Plaintiff again and found her affect blunted but appropriate and her mood "down."  (R. at 1275.)

On October 12, 2012, Dr. Hale saw Plaintiff again.  (R. at 1372-1374.)  Plaintiff reported that she takes her buproprion inconsistently because a pharmacy clerk told her it was dangerous to take simultaneously with citalopram.  (R. at 1372.)  Plaintiff states that she "constantly" worries about all of the medications she takes.  (*Id.*)  Dr. Hale noted that Plaintiff was taking fifteen VA-prescribed medications, four non-VA prescribed medications, with one pending VA-prescription.  (R. at 1372-1373.)  Plaintiff also reported difficulty with social interaction, including backing out of attending a wedding.  (R. at 1372.)  Dr. Hale concluded that Plaintiff's overall condition had not improved since their last appointment.  (R. at 1373.)  Dr. Hale also decided to taper Plaintiff off of buproprion and start her on effexor.  (*Id.*)  On December 17, 2012, Plaintiff reported improvement on effexor, but also reported problems with high blood pressure and leg swelling when on the medication.  (R. at 1791.)  Dr. Hale decided to discontinue effexor, continue trazodone, and start a trial treatment of cymbalta.  (R. at 1794.)  Plaintiff subsequently contacted Dr. Hale by telephone on January 25, 2013 to report that the new treatment was not working.  (R. at 1779.)  Plaintiff also reported increased depression and staying in bed.  (*Id.*)  Dr. Hale directed Plaintiff to begin increased dosages of cymbalta.  (*Id.*)

On March 15, 2013, Plaintiff again saw Dr. Hale.  (1764-1768.)  Plaintiff reported that she stopped taking cymbalta after one week because "it paralyzed me."  (R. at 1765.)  According to Plaintiff, she recovered functionality after two days of not taking the drug.  (*Id.*)  Plaintiff also reported feeling "very depressed," not wanting to leave the house, and increased eating as stress-

relief.  (*Id*.)  Dr. Hale noted the ineffectiveness and adverse side effects of Plaintiff's prior medications and prescribed a trial of sertraline to replace cymbalta.  (R. at 1764-1767.)

On April 19, 2013, Plaintiff saw David Dietz, as part of her VA disability evaluation.  (R. at 1680-1690.)  Dr. Dietz noted that, because of her PTSD, Plaintiff continues to suffer nightmares and wakes up in a panic once a week.  (R. at 1689.)  Dr. Dietz also noted significant symptoms of depression, which he believed were more likely related to her chronic pain and limited mobility than to her PTSD.  (*Id*.)  Dr. Dietz concluded that Plaintiff suffers "[o]ccupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although generally functioning satisfactorily, with normal routine behavior, self-care and conversation."  (R. at 1684.)

On May 31, 2013, saw Dr. Hale and reported, "I am not doing well."  (R. at 1669.) Plaintiff also reported feeling "stuck in depression" and sleeping all day.  (*Id*.)  Plaintiff also reported discontinuing sertraline because she slept too much and felt depressed.  (*Id*.)  Dr. Hale found Plaintiff's overall condition to be stable but with additional symptoms of depression.  (R.at 1672.)  Dr. Hale again changed Plaintiff's medications to a trial of citalopram and Abilify.  (*Id*.) On August 9, 2013, Plaintiff again saw Dr. Hale and reported improvement.  (R. at 1646-1650.) Dr. Hale informed Plaintiff that she could no longer serve as her psychiatrist because she would be transferring to a different clinic.  (R. at 1647.)

On October 31, 2013, Plaintiff saw Tiffany Bell, M.D., for continuing treatment of her depression and PTSD.  (R. at 1575-1580.)  Plaintiff reported experiencing daily sadness for no particular reason, poor concentration, low motivation, chronic fatigue, crying spells, and feelings

of hopelessness, worthlessness, and being overwhelmed. (R. at 1575-1576.) Dr. Bell increased Plaintiff's dosages of Abilify and citalopram. (R. at 1578.)

On April 21, 2014, Rashim Gupta, M.D. assumed responsibility for Plaintiff's psychiatric treatment. (R. at 1542-1547.) Plaintiff reported running out of medication, feeling down, poor sleep, and difficulty concentrating. (R. 1542-1543.) Dr. Gupta continued Plaintiff's prescriptions for Abilify and citalopram. (R. at 1546.)

On August 29, 2014, Dr. Gupta completed a medical source statement assessing Plaintiff's PTSD and Major Depressive Disorder. (R. at 1844-1845.) Noting that Plaintiff has been a patient of her practice since 2010, Dr. Gupta opined that, up to one-third of the work day, Plaintiff can follow work rules; respond appropriately to changes in routine settings; function independently without redirection; understand, remember and carry out complex, detailed and simple job instructions; behave in an emotionally stable manner; and, leave home on her own. (R. at 1844-1845.) Dr. Gupta further opined that Plaintiff can only rarely use judgment; maintain attention and concentration for extended periods of two-hour segments; maintain regular attendance and be punctual within customary tolerance; deal with the public; relate to co-workers; interact with supervisors; work in coordination with or proximity to others without being distracting; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; socialize; and, relate predictably in social situations. (*Id*.)

### 2. State agency review

On December 6, 2010, Plaintiff saw Margaret G. Smith, Ph.D., at the state agency's request. (R. at 828-833.) Plaintiff reported depression, PTSD, and chronic lower back pain. (R. at 828.) According to Plaintiff, she began suffering from depression after being raped in 1994 by another service member. (R. at 829.) Plaintiff reported feeling hopeless and helpless, only socializing with family, attending church every other week, and cooking about once weekly. (R.at 829-830.) Plaintiff also reported that she suffers from crying spells two or three times weekly, low energy, low sex drive, memory problems, and difficulties with concentration. (R. at 830.) Plaintiff further reported that she experiences nightmares about the rape once or twice weekly and that her PTSD-related symptoms worsened when, several years after the attack, she encountered her attacker. (R. at 831.) Plaintiff stated that she mostly stays at home, where she does her physical therapy exercises, watches television, and reads. (R. at 830.)

Dr. Smith diagnosed Plaintiff with Major Depression, Recurrent, Moderate and PTSD. (R. at 832.) Dr. Smith found Plaintiff's ability to relate to others, including fellow workers and supervisors, to be mildly impaired. (R. at 833.) Dr. Smith also found that Plaintiff might have difficulty in jobs that require work in isolated situations with men. (*Id*.) Dr. Smith further found Plaintiff's ability to maintain attention, concentration, persistence, and pace in performance of routine tasks to be moderately impaired. (*Id*.) Dr. Smith opined that Plaintiff could complete simple and repetitive work tasks. (*Id*.) Dr. Smith also opined that Plaintiff's "mental ability to withstand the stress and pressures associated with day-to-day work activities is moderately impaired as long as she continues on her medication." (*Id*.)

On December 13, 2010, Suzanne Castro, Psy.D., completed a mental residual functional capacity assessment on behalf of the state agency by reviewing Plaintiff's medical file. (R. at 155-156.) Dr. Castro opined that Plaintiff is moderately limited in her ability to maintain concentration and attention for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in her work setting. (R. at 155-156.) On May 13, 2011, State agency psychologist Robyn Hoffman, Ph.D., affirmed Dr. Castro's assessment. (R. at 170-171.)

## IV. THE ADMINISTRATIVE DECISION

On November 14, 2014, the ALJ issued his decision. (R. at 17-31.) Plaintiff met the insured status requirements through December 31, 2014. (R. at 20.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

gainful activity since November 15, 2007, the alleged onset date.  (*Id*.)  The ALJ found that

Plaintiff had the severe impairments of tendonitis, degenerative disc disease, obesity, depressive

disorder, and PTSD.  (R. at 21.)  He further found that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled one of the listed impairments

described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*.)  At step four of the sequential

process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] finds that the claimant
> has the residual functional capacity to perform light work as defined in 20 CFR
> 404.1567(b) and 416.967(b) except the claimant can frequently kneel, crouch, and
> crawl.  She can occasionally stoop and climb of ramps and stairs.  The claimant is
> precluded from climbing ladders, ropes, and scaffolds.  She can frequently handle,
> finger, and feel with the right upper extremity.  The claimant is precluded from
> working in an environment with high production quotas, such as piecework,
> assembly line work, strict time requirements, arbitration, negotiation,
> confrontation, and directing the work of or being responsible for the safety of
> others.  She can respond appropriately in a work setting where changes are few
> and expected.  Further, the claimant is restricted from working in isolation with
> men.

(R. at 24.)  In reaching this determination, the ALJ assigned "some weight" to the state agency

consultants' mental assessments that found Plaintiff mildly limited in social functioning and

moderately limited in her activities of daily living and maintain attention and concentration.  (R.

at 28.)  The ALJ gave "significant weight" to the limitation on Plaintiff's ability to maintain

attention and concentration, but less weight to the other limitations.  (*Id*.)  According to the ALJ,

"The record supports the claimant was capable of engaging in normal activities of daily living."

(*Id*.)  The ALJ also gave "great weight" to the state agency consultants' physical assessments.

(R. at 29.)

The ALJ gave "little weight" to Dr. Gupta's opinion evidence because "Dr. Gupta's

opinions are more restrictive than the medical evidence of records supports."  (R. at 29.)  The

ALJ, however, gave "significant weight" to the opinion of consultative examiner, Dr. Smith. (*Id.*)

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform her past relevant work as an administrative assistant and a data communication analyst. (R. at 30.) He, therefore, concluded that Plaintiff was not disabled under the Social Security Act. (R. at 31.)

## VII.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII.  ANALYSIS

Plaintiff puts forward three assignments of error.  Plaintiff first contends that the ALJ did not properly weigh the opinion of Dr. Gupta, whom Plaintiff argues is entitled to great weight as a treating source.  (ECF No. 14 at 17.)  Second, Plaintiff contends the ALJ failed to consider the entire record and incorrectly relied on non-examining agency opinions and consultative examining opinions that Plaintiff argues are outdated.  (*Id*. at 20.)  Last, Plaintiff contends that the ALJ erred in relying on the VE's testimony to support his conclusion that Plaintiff can return to her past relevant work.  (*Id*. at 24.)

## A.  The ALJ Erred in Relying on the VE's Testimony

The Court turns first to Plaintiff's last contention of error.  Plaintiff argues that the VE's testimony does not support the ALJ's finding that Plaintiff can return to her past relevant work and that, therefore, the ALJ's conclusion that Plaintiff is not disabled is unsupported by substantial evidence in the record.  (*Id*. at 24-25.)

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments, that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279 2008 WL 4793424 (E.D. Mich.2008), citing, 20 C.F.R. §§ 404.1520, 416.920. "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

The ALJ found that Plaintiff is capable of performing her past relevant work as an administrative assistant and data communication analyst. He relied on the VE's testimony regarding the skill levels and non-exertional demands of Plaintiff's past work. Plaintiff contests the validity of the hypothetical question posed to the VE, which elicited, at best, equivocal testimony regarding whether Plaintiff's past work involved negotiation and other higher-level conflict resolution skills:

ALJ: If I indicated that this individual should be precluded from high production quotas such as piece work or assembly line work, strict time requirements,

arbitration, negotiation, confrontation, directing the work of others, being responsible for the safety of others how would that change your answer? Would this individual still be able to perform the past relevant work of the claimant?

VE: Actually the data analyst job would, and, actually and the administrative assistant, both of those, not necessarily the issue would be fast paced but they do have like negotiating and some of the higher level activities associated with performance of the job but I would not preclude them for fast paced.

(R. at 74.)

Plaintiff contends that, while the VE found that Plaintiff's past relevant work did not require fast-paced activities, the VE's testimony, as set forth above, indicated that the work would include negotiating and other high-level activities which were precluded by the RFC that the ALJ ultimately adopted. On this measure, the Commissioner has only this to say: "It is not apparent from the testimony that the VE found her jobs as an administrative assistant and data communication specialist involved negotiation," and that "Plaintiff has not offered any evidence that her past work involved negotiation." (ECF No. 18, at 15-16.) The Commissioner complains that Plaintiff, therefore, has not met her burden to prove she cannot perform her past relevant work.

In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the vocational expert with ALJ's assessment of the what the claimant "can and cannot do.").

Here, the ALJ relied on the VE's testimony in response to a hypothetical question that stated, in relevant part, that a person "should be precluded from . . . "arbitration, negotiation, confrontation, directing the work of others, [or] being responsible for the safety of others. . . ." (R. at 74.) The ALJ incorporated this hypothetical into his RFC finding. The Court finds, however, that the ALJ's determination to the effect that Plaintiff could perform her past-relevant work is not supported by substantial evidence because the RFC indicated that she would be precluded from high-stress work involving, *inter alia*, negotiation. The hypothetical posed to the VE included these limitations, but the VE testified that Plaintiff's previous jobs would involve "negotiating," and "other higher level activities," presumably aspects of such things as arbitration or confrontation. In formulating the hypothetical, an ALJ is "required to incorporate those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). While the ALJ posed a hypothetical that incorporated mental limitations he found credible, the VE testified that Plaintiff's previous jobs would involve some of those limitations, including negotiation, among other things.

In the Court's view, the VE appears to express at least two separate thoughts combined however unartfully. The Court construes the VE's first thought to read, "Actually the data analyst job would, and, actually and the administrative assistant, both of those, not necessarily the issue would be fast paced . . . but I would not preclude them for fast paced." (R. at 74.) Put another way, the VE did not consider these jobs to be fast-paced. This construction is supported by the ALJ's follow-up question and the VE's response that the two jobs "have a pace but I wouldn't consider it fast paced," indicating that, even though the jobs have a pace requirement, they are not precluded by that pace requirement. (R. at 74-75.) The Court construes the VE's

second thought to read, "but they do have like negotiating and some of the higher level activities associated with performance of the job." (R. at 74.) This thought is distinct from the first insofar as it does not address the pressures of performing a task in a specified time, but rather the stresses of performing the complexity of a task at all. The question before the Court, then, is whether this second thought supports the ALJ's conclusion that Plaintiff's past work is not precluded by "negotiation."

To be clear, the Court cannot interpret the VE's statement, whatever it may mean, to say that Plaintiff's past relevant work is free of negotiation and other high-stress conditions. The VE's words plainly state that Plaintiff's past jobs "have like negotiating" as well as other "higher activities" that the VE would place alongside negotiation in complexity or difficulty. (*Id*.) The Court finds, therefore, that the VE's statement is not substantial evidence supporting the ALJ's conclusion that Plaintiff can perform her past relevant work.

The Court is mindful, however, that at step four of the sequential analysis, the burden lies with Plaintiff to prove she cannot perform her relevant past work. *Jones*, 336 F.3d at 474. The VE's words may amount to substantial evidence supporting the conclusion that Plaintiff cannot perform her previous work. Given that interpretation, the record contains no other evidence that would then contradict the conclusion that Plaintiff's prior relevant work requires "arbitration, negotiation, confrontation" and other "higher activities" precluded by the ALJ's RFC. (R. at 24, 74.)

That is not to say, however, that the Court can, with sufficient certainty, interpret the VE's testimony as definitely precluding Plaintiff's past relevant work. First, the VE never testified that Plaintiff would be precluded from performing her past relevant work. Second, it is

23

not clear what the VE means by "associated with performance of the job." (R. at 74.) The Court cannot rule on this issue because the VE never completed this thought, and neither the ALJ nor Plaintiff's counsel elicited responsive follow-up comments in their questioning. Because there is no other substantial evidence of record addressing the presence of stressors such as "negotiation" and its possibly preclusive effect on Plaintiff's past relevant work, the VE's response, if clearly stated, would have proved conclusive on this question. The point is, the ALJ's lack of explanation prevents this Court from conducting meaningful review to determine whether substantial evidence supports his decision. *See Rogers* 486 F.3d at 248 (quoting *Hurst*, 753 F.2d at 519) ("It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review."); *Reynolds v. Comm'r of Soc. Sec.*, No. 09–2060, 2011 WL 1228165, at *4 (6th Cir. Apr. 1, 2011) (quoting 5 U.S.C. § 557(c)(3)(A)) (noting that an ALJ's decision "must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.'"). This Court must, therefore, remand this action for an explanation of the reasoning supporting the ALJ's RFC determinations.

The ALJ's reliance on the VE's testimony is not harmless error. An error is harmless only if remanding the matter to the agency "would be an idle and useless formality" because "there is [no] reason to believe that [it] might lead to a different result." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 520 (6th Cir. 2011) (citing *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x. 171, 173 (6th Cir. 2004)). As explained above, however, a clarification of the VE's testimony together with the ALJ's clarification as to how he arrived at the RFC would provide sufficient bases from which this Court could conduct a meaningful review.

**B. Plaintiff's Remaining Contentions of Error**

This finding above obviates the need for in-depth analysis of Plaintiff's first and second assignments of error. Thus, the Court need not, and does not, resolve the alternative bases Plaintiff asserts supports reversal and remand. The Court, however, invites the Commissioner to assess whether the ALJ properly evaluated Dr. Gupta's opinion evidence and the bulk of the medical evidence in this case.

It is clear from the record that Plaintiff has received primary care for her service-related, and other, conditions through the VA for the duration of the time period in question. For the time period in question, the record contains hundreds upon hundreds of pages of medical records and treatment source statements for the conditions in question. The VA ultimately adjudicated Plaintiff 90% disabled and completely unemployable. (R. at 66.) Yet, the ALJ briefly dismissed Dr. Gupta's 2014 findings, declining to find her a treatment source, and gave her opinion evidence little weight. (R. at 29.) The ALJ arrived at this conclusion even though Plaintiff had been seen at the same practice for four years and Dr. Gupta had access to all of her treatment records, as well as access to the other providers themselves. This treatment of Dr. Gupta's evidence contrasts markedly with the great weight given to the more Commissioner-friendly opinions rendered by state agency examiners who did not have access to the bulk of the medical evidence now available for analysis.

Furthermore, the Court harbors reservations regarding the ALJ's interpretation of the record. The ALJ found that "[Plaintiff] remains capable of engaging in normal activities of daily living . . .. The claimant herself noted improvement to her conditions since living with her sister, taking medications, and participating in treatment." (R. at 29.) Plaintiff's mental health history

can charitably be described as erratic: sometimes improving, sometimes regressing, while she and her providers struggle to find a consistently effective treatment plan for her PTSD and depression. In October 2013, two months after reporting progress, Plaintiff reported daily sadness for no particular reason, poor concentration, low motivation, chronic fatigue, crying spells, and feelings of hopelessness, worthlessness, and being overwhelmed. (R. at 1575-1576.) The record establishes an adult woman, exceedingly medicated, whose only social interactions include occasional movies with her sister, church attendance twice a month, and occasional trips to the grocery store. Furthermore, the record is devoid of evidence demonstrating any significant, recurring interaction with adult males, even social interactions with her own brother-in-law. (R. at 70.)

The ALJ notes that he properly gave little weight to the VA's disability determination due both to his ultimate responsibility to determine disability and to the two agencies' different rating systems, rules, and regulations. (R. at 28.) The Court, however, is concerned that the ALJ, in properly disregarding the VA's ultimate disability rating, may have also disregarded credible VA medical evidence, evidence that constitutes the vast majority of both objective and opinion evidence in this matter.

## IX. CONCLUSION

In sum, for the reasons stated above, the Court concludes that substantial evidence does not support the ALJ's decision denying benefits. Accordingly, Plaintiff's Statement of Errors is **AFFIRMED** and the Commissioner of Social Security's nondisability finding is **REVERSED** and **REMANDED** to the Commissioner and the ALJ under Sentence Four of § 405(g). The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**


Date: September 28, 2017                               <u>    /s/ *Elizabeth A. Preston Deavers*    </u>
                                                             ELIZABETH PRESTON DEAVERS
                                                             UNITED STATES MAGISTRATE JUDGE